Thomas D. Smith, Esquire (ISB No. 8206)
**SPINNER, WOOD & SMITH**
1335 East Center - P.O. Box 6009
Pocatello, Idaho 83205-6009
Telephone: (208) 232-4471
Email: tom@pocatello-law.com

Attorneys for Patrick J. Geile, Trustee

UNITED STATES BANKRUPTCY COURT

DISTRICT OF IDAHO

| | |
|---|---|
| In the Matter of: | Case No. 23-40398-NGH |
| AMBER RENEE HOBBS, | Chapter 7 |
| Debtor. | |
| PATRICK J. GEILE, TRUSTEE, | Adversary Case No. |
| Plaintiff, | |
| vs. | |
| JOHN C. SHIRLEY and APRIL E. SHIRLEY, | |
| Defendants. | |

**COMPLAINT**

COMES NOW the Plaintiff, Patrick J. Geile, Trustee, through his attorneys, for a claim of relief and alleges as follows:

JURISDICTION AND VENUE

1. This Court has jurisdiction over this case pursuant to 28 USC §§ 157 and 1334, and pursuant to the rules of this Court and the United States District Court for the District of Idaho.

2. Venue is proper pursuant to 28 USC § 1409(a).

COMPLAINT - 1

3. This is a core proceeding pursuant to 28 USC § 157(b)(2)(A) and (H).

4. On August 23, 2022, the Debtor, Amber Renee Hobbs, filed a petition to initiate a chapter 7 bankruptcy proceeding, Case No. 23-40398-NGH. This action arises under Title 11 of the United States Code, and arises out of and is related to the pending bankruptcy proceeding.

5. The Plaintiff is the duly appointed and acting Trustee of the bankruptcy estate.

6. The Defendants, John C. Shirley and April E. Shirley, are residents of Salt Lake County, Utah.

7. The Plaintiff consents to the Court's jurisdiction to decide this matter.

8. The Plaintiff has been required to retain counsel to pursue this action and is incurring reasonable costs and attorneys' fees.

## FACTS APPLICABLE TO ALL CLAIMS

9. The Debtor is the Defendant's daughter.

10. On January 4, 2017, the Debtor purchased real property located at 1171 East Sherman Avenue, Salt Lake City, Utah 84106 ("Utah Real Property") which was titled in both the Debtor and John Shirley's names.

11. The Debtor resided at the Utah Real Property.

12. On June 19, 2020, the Debtor sent a text message to April Shirley that states the Debtor was going to place "my house on the market for sale."

13. On July 20, 2020, the Debtor sent a text message to April Shirley that states, "I'm ready to refinance my mortgage and if you guys are still willing to help me do that please reach out in the next couple days as I'd like to do it ASAP."

14. On or about June 29, 2021, Mark Nelson and Kristin Nelson filed a lawsuit in the Third Judicial District Court, Salt Lake County, Utah, Case No. 210903400 ("Utah state court litigation"), against the Debtor and her company H & H Design, LLC ("H & H Design").

COMPLAINT - 2

15. The Debtor is the sole member of H & H Design.

16. Sometime around July of 2021 the Debtor moved to Hailey, Idaho.

17. On August 26, 2021, the Debtor and John Shirley sold the Utah Real Property and received $364,551.58 in net sale proceeds.

18. At the time of the sale, the Debtor and John Shirley did not have a written agreement regarding how to divide the proceeds from the sale of the Utah Real Property.

19. The Debtor deposited the entire $364,551.58 sale proceeds into her personal account at Mountain America Credit Union ("MACU 2644").

20. The Debtor exercised dominion and control over the $364,551.58 sale proceeds after it was deposited into her MACU 2644 account. The Debtor subsequently commingled the $364,551.58 with her personal funds in various accounts she controlled, and the Debtor decided how all of the funds would be used. The Debtor used some of the $364,551.58 to pay her debts and other personal expenses.

21. On or about September 29, 2021, the Debtor transferred $30,000 from her MACU 2644 account to an account at Mountain America Credit Union she opened for H & H Design ("MACU 2588"). The Debtor controlled the MACU 2588 account and decided how the funds would be used.

22. On or about October 1, 2021, the Debtor wired $175,000 from her MACU 2644 account to her Coinbase account. The Debtor controlled her Coinbase account and decided how the funds would be used.

23. On or about November 24, 2021, Registered Agents, Inc. ("Registered Agents"), a registered agent service provider, filed a Limited Liability Company Articles of Organization with the Wyoming Secretary of State to create Yellow Dogs, LLC ("Yellow Dogs"). The Debtor's name does not appear anywhere on the documents Registered Agents filed with the

COMPLAINT - 3

Wyoming Secretary of State. The Wyoming Secretary of State issued a Certificate of Organization for Yellow Dogs on the same date.

24. The Debtor is the sole member of Yellow Dogs.

25. The Debtor's name does not appear while conducting an online business entity search for Yellow Dogs through the Wyoming Secretary of State's website.

26. On or about January 17 and 18, 2022, the Debtor wired $25,000 and $50,000 respectively from her MACU 2644 account to an account she opened in the name of Yellow Dogs at Bank of Jackson Hole ("Yellow Dogs account"). The Debtor controlled the Yellow Dogs account and decided how the funds would be used.

27. Sometime during the end of 2021 or the beginning of 2022, the Debtor began working with real estate agent Sue Radford ("Radford") to purchase a home in Hailey. The Debtor referred to Radford as "my agent" in text messages she sent to April Shirley.

28. The Debtor decided to purchase real property located at 860 Fox Acres Road, Hailey, Idaho 83333 ("Idaho Real Property"). The Debtor was involved with all aspects of purchasing the Idaho Real Property including communicating with Radford, reviewing inspection reports, arranging an appraisal, and negotiating counteroffers.

29. On or about January 21, 2022, Radford submitted an offer to purchase the Idaho Real Property for $580,000 which included $15,000 earnest money. The Defendants were listed as the buyers and they signed the offer.

30. On January 23, 2022, the sellers made a counteroffer of $590,000 to sell the Idaho Real Property, and the Debtor sent a text message to April Shirley that states, "[w]e got a counter offer $590 k." The Defendants signed the acceptance of the counteroffer.

31. The Defendants obtained a loan to purchase the Idaho Real Property through Bank of the West.

COMPLAINT - 4

32. For the Defendants to qualify for the loan to purchase the Idaho Real Property, Bank of the West required the Defendants to provide proof of an agreement between the Debtor and John Shirley regarding the division of the Utah Real Property sale proceeds, and an explanation regarding Yellow Dogs's involvement with holding the sale proceeds. The Debtor and/or John Shirley subsequently drafted a written agreement dated August 25, 2021, that purports to memorialize an oral agreement between them to divide the $364,551.58 proceeds from the sale of the Utah Real Property. The agreement indicates the Debtor deposited the entire $364,551.58 into her MACU 2644 account, and John Shirley was owed $182,275.79 to be paid within twelve months of closing on a new property. The Debtor and John Shirley's signatures on the agreement are dated August 25, 2021, and September 25, 2021, respectively. The agreement was prepared so the Defendants could qualify for the loan to purchase the Idaho Real Property.

33. Other than obtaining the loan in their name to purchase the Idaho Real Property, the Defendants did not pay any funds to purchase the property from accounts they controlled. Rather, all of the funds to purchase the Idaho Real Property and to make the loan payments came from the Debtor's accounts which she solely controlled.

34. On January 25, 2022, the Debtor wrote a check to National Financial Services, LLC for $26,000 on her Yellow Dogs account. National Financial Services, LLC is affiliated with Fidelity, and this check was for the Debtor's personal account at Fidelity where she opened an individual account, a Roth IRA, a traditional IRA, and a self-employed 401(k). The Debtor controlled her Fidelity accounts and decided how the funds would be used.

35. On January 30, 2022, the Debtor wrote a check to April Shirley for $16,000 on her Yellow Dog account which was used to purchase the Idaho Real Property.

36. On February 1, 2022, $6,700 was wired into the Debtor's account at Idaho Central Credit Union ("ICCU 5634"), and the same day the Debtor wired $6,700 to her Yellow Dogs account.

37. On February 2, 2022, the Debtor wired $6,400 from her ICCU 5634 account to her Yellow Dogs account.

38. On February 7, 2022, after reviewing the inspection report that identified repairs needed for the Idaho Real Property, the Debtor sent a text message to April Shirley that states "I want to go back in with $565k due to the numerous items on the inspection." On the same day the Debtor sent an email to Radford that states, "[i]n total, I see a minimum $25k in repairs and replacement costs to meet standard levels of safety and health. With the onerous list from the inspector and the numerous unknown replacement and repair costs identified by the inspection report my offer stands at $565,000.00."

39. On or about February 7, 2022, the Debtor wrote a check on her Yellow Dogs account to April Shirley for $30,000 which was used to purchase the Idaho Real Property.

40. On or about February 22, 2022, the Debtor wired $159,980 from her Blockfi Trading account to her personal account at Idaho Central Credit Union ("ICCU 9078"). The Debtor controlled her Blockfi account and decided how the funds would be used.

41. On or about February 28, 2022, the Debtor wired $130,000 from her ICCU 9078 account to the Defendants which was used to purchase the Idaho Real Property.

42. The Idaho Real Property sale closed on or around March 4, 2022.

43. The Debtor resided at the Idaho Real Property after the sale closed.

44. The Debtor used funds in her Yellow Dogs account to pay for appliances, furniture, and repairs to the Real Property. Meanwhile, the Debtor also used funds in her Yellow Dogs account to pay for personal expenses.

COMPLAINT - 6

45. On March 16, 2022, Carolle Dogbevi, a mortgage processor for Bank of the West, sent an email to the Defendants that states:

> I just spoke with the underwriter, we are missing all of the pages of the original agreement dated 8/25/2021. This agreement needs to include the fact that Yellow Dogs LLC is some type of custodian for the net proceeds received from the sale of the house located at 1171 Sherman Ave. (missing signatures) We are also missing the articles of incorporation for Yellow Dogs LLC.

46. The Defendants never resided at the Idaho Real Property. Nonetheless, on March 22, 2022, while opening a utility account with the city of Hailey, John Shirley stated in an email that "[w]e appreciate your service and look forward to our time in Hailey."

47. On March 29, 2022, the Debtor wired an additional $15,000 from her ICCU 9078 account to the Defendants which was used to purchase the Idaho Real Property and/or to make payments on the loan to purchase the property.

48. The Debtor transferred at least $191,000 to the Defendants to purchase the Idaho Real Property. These transfers left the Debtor with insufficient funds to pay all of her creditors including the Nelsons.

49. The monthly loan payment for the Idaho Real Property is approximately $2,700. After purchasing the Idaho Real Property, the Debtor routinely made $3,400 payments each month to the Defendants from her accounts which they identify as "rent" for living at the Idaho Real Property. The Defendants kept the extra money the Debtor paid each month in a separate account to make loan payments in case the Debtor missed a monthly payment.

50. On April 4, 2022, the Utah state court entered a judgment against H & H Design for $160,670.39 in the Utah state court litigation.

51. On or about April 7, 2022, the Debtor wired $50,000 from her Blockfi Trading account into her ICCU 9078 account.

52. On April 8, 2022, the Debtor wired $35,000 and $6,000 and on April 13, 2022, the Debtor transferred $6,000 all from her ICCU 9078 account to her Fidelity account.

53. On August 18, 2022, the Utah state court entered a judgment against the Debtor and H & H Design jointly and severally for $158,711.11 in the Utah state court litigation.

54. By the end of 2022, the Debtor transferred a total of $75,725.66 into her retirement accounts at Fidelity.

55. On January 5, 2023, the Utah state court entered an augmented judgment against the Debtor and H & H Design in the Utah state court litigation that increased the amount of the judgment entered on April 4, 2022, to $168,858.39, and increased the amount of the judgment entered on August 18, 2022, to $160,899.11.

56. On February 1, 2023, the Debtor wired $6,700 from her ICCU 5634 account to her Yellow Dogs account.

57. On February 2, 2023, the Debtor wired $6,400 from her ICCU 5634 account to her Yellow Dogs account.

58. On March 3, 2023, the Utah state court entered an order in the Utah state court litigation that authorized the Nelsons to conduct post-judgment discovery, and that restrained the Debtor from transferring or concealing any of the Debtor's property.

59. On or about April 18, 2023, the Debtor sent a text message to April Shirley which states in part:

> Here comes a novel…..
>
> John is confident the house is totally safe and also says I should have paid you ALL the money from the sale of the house instead of a portion. Then all of it would have been protected.
>
> And also, that I need to act super fast. No time to spare. He gave me the number to an attorney he considers well versed and has closely worked with for many years. He will call him in the morning to set me up as a priority client and the pressing need to act fast.

COMPLAINT - 8

> In the meantime time, I'll continue making rent payments to you. He said paying the market rate and not the exact mortgage rate was a good decision.
>
> It's going to be expensive to work with the recommended attorney but not nearly as expensive as the original claim the clients filed. I have to move fast. And the recommended solution is a Chapter 7, the fastest but most painful method that leads to the earliest recovery.
>
> He sees no reason why I can't use Idaho exemptions that are far more generous than Utah's. That is TBD. They will liquidate whatever necessary to pay off secured debt.

60. On May 15, 2023, the Debtor responded to the Nelsons' post-judgment discovery request in the Utah state court litigation by failing to answer most of the interrogatories and request for production of documents related to the Debtor's property. The Defendant also filed a motion to stay the Nelsons' post-judgment discovery efforts.

61. On May 24, 2023, the Utah state court held a status conference in the Utah state court litigation where it ordered the Defendant to provide her response to the Nelsons' post-judgment discovery request by June 14, 2023.

62. On June 15, 2023, the Debtor filed a second motion in the Utah state court litigation to stay the Nelsons' post-judgment discovery efforts.

63. On June 16, 2023, the Nelsons filed a motion in the Utah state court litigation for sanctions against the Debtor for failing to comply with the Nelsons' post-judgment discovery requests. A show cause hearing on the Nelsons' motion was scheduled on August 24, 2023.

64. On or about July 16, 2023, the Nelsons' attorney in the Utah state court litigation filed a notice of intent to subpoena the Defendants for depositions and to produce documents regarding the Debtor's assets.

65. Sometime between July 16, 2023, and July 28, 2023, the Debtor sent a text message to April Shirley that states:

COMPLAINT - 9

> Okay, I will need to talk to him today about the subpoena. I'll file a motion for you to review.
>
> I do know that Dad (and you) just don't want to be involved and selling would be the very easiest thing for both of you.
>
> For me, that would uproot me. Have to find a totally new home. And that could be anywhere, literally. I don't want to start my life over again. I want to fight to maintain this one. Both my attorneys have said selling at this point is a bad idea. It will give the Trustee ALL the proceeds and I will not have a home or be able to buy one for a very long time or ever. But….whatever makes you feel good and if cutting ties is what you want then I'm disappointed but I understand.

66. On August 7, 2023, the Debtor transferred $14,000 from her Fidelity retirement account to her ICCU 9078 account.

67. On August 16, 2023, the Nelsons' attorney in the Utah state court litigation deposed the Defendants regarding the Debtor's assets.

68. On August 21, 2023, the Debtor transferred $10,000 from her Fidelity retirement account to her ICCU 9078 account.

69. On August 23, 2023, the Debtor filed her bankruptcy petition. The show cause hearing scheduled the following day was vacated.

70. The Debtor claimed an exemption in the $39,764.67 in her Fidelity account on the petition date under Idaho Code §§ 55-1011 and 11-713(3).

71. In her initial Statement of Financial Affairs, the Debtor lists her occupation as interior designer and her employer as Yellow Dogs. In her amended Statement of Financial Affairs, the Debtor indicates the nature of Yellow Dogs's business as interior design and property management.

COUNT ONE
**Declaratory judgment that the Idaho Real Property is bankruptcy estate property arising from the Debtor's beneficial interest in a resulting trust**

72. Paragraphs 1 through 71 are incorporated as if set forth fully in this Count.

73. Under Idaho law, a resulting trust may arise "where title to property is transferred to one party, the trustee, although another party, the beneficiary of the trust, paid or incurred an absolute obligation to pay for that property." *Hopkins v. Espino (In re Espino)*, 648 B.R. 235, 247 (Bankr. D. Idaho 2022) (citing *Hettinga v. Sybrandy*, 126 Idaho 467, 470, 886 P.2d 772, 775 (Idaho 1994)).

74. To establish a resulting trust in the Idaho Real Property, the Plaintiff must prove: (1) the Debtor and the Defendants intended for the Defendants to hold title to the property, and (2) the Debtor paid or incurred an absolute obligation to pay for the property at the time it was purchased. *Id.* at 247.

75. The communications between the Debtor, the Defendants, and others involved with the purchase and financing of the Idaho Real Property establish that the Debtor and the Defendants intended for the Defendants to hold title to the Idaho Real Property and not the Debtor.

76. The Debtor had an interest in the funds used to purchase the Idaho Real Property because the funds came from accounts over which she exercised dominion and control, and which could have been used to pay her creditors. *See, e.g., Wolkowitz v. Beverly (In re Beverly)*, 374 B.R. 221, 223 (9th Cir. BAP 2007) ("[A] transfer of an interest of the debtor in property . . . refers to property that would have been part of the estate had it not been transferred before bankruptcy.") (alteration added and internal quotations omitted); *Hansen v. MacDonald Meat Company (In re Kemp Pacific Fisheries, Inc.)*, 16 F.3d 313 (9th Cir. 1994) (finding transfers of a debtor's interest in property including a transfer by a debtor of borrowed funds and a transfer that

will "deprive the bankruptcy estate of something which would otherwise be used to satisfy the claims of creditors").

77. The Debtor paid or incurred an absolute obligation to purchase the Idaho Real Property at the time it was purchased because the Debtor paid all of the funds to purchase the property and subsequent loan payments with funds in which she had an interest. *See Espino*, 648 B.R. at 248. In contrast, the Defendants did not use any funds under their control to purchase the property, and they maintained a separate account with funds from the Debtor to make the loan payments in case the Debtor did not have sufficient funds to make the payments.

78. The Debtor and the Defendants intended for the Debtor to retain a beneficial interest in the Idaho Real Property because the Debtor resided there and exercised all indicia of ownership including making all of the payments to maintain the property. *See In re Price*, Adversary No. 08-01084 (9th Cir. BAP June 24, 2009) ("A resulting trust is created when a person conveys a property's legal title to another under circumstances that reasonably show the person did not intend for the grantee to have the beneficial interest in the property.").

79. Pursuant to 11 U.S.C. § 541(a)(1), the Debtor's beneficial interest in the Idaho Real Property arising from the resulting trust is estate property.

80. The Court should declare that the Idaho Real Property is estate property under Idaho's resulting trust provisions.

COUNT TWO
**Avoidance of the transfers of the funds the Debtor paid to the Defendants to purchase the Idaho Real Property under the Bankruptcy Code and Idaho's Uniform Fraudulent Transfer Act ("UFTA")**
**(actual fraud)**

81. Paragraphs 1 through 80 are incorporated as if set forth fully in this Count.

82. The Debtor transferred at least $191,000 to the Defendants to purchase the Idaho Property with actual intent to hinder, delay, or defraud her creditors. The Debtor's intent is

COMPLAINT - 12

established by her communications with the Defendants where the Debtor set forth her plans to shield her property from the Nelsons by having the Idaho Real Property titled in the Defendants' names.

83. The Debtor's intent to hinder, delay, or defraud her creditors may be inferred from the following commonly recognized badges of fraud present in this case:

    a.    The Defendants are insiders as defined in 11 U.S.C. § 101(31)(A)(i) because they are the Debtor's parents.

    b.    The Debtor retained possession and control of the Idaho Real Property after the sale closed including exercising all indicia of ownership.

    c.    The transfers and obligations to purchase the Idaho Real Property were concealed because, unlike the Utah Real Property which was titled jointly in the Debtor and John Shirley's names, the Idaho Real Property was titled solely in the Defendants' names. Additionally, the Debtor's name was not disclosed as an owner of Yellow Dogs when the company was formed.

    d.    The Nelsons sued the Debtor before the transfers were made.

    e.    The transfers were of substantially all the debtor's assets available to pay creditors because she transferred a substantial portion of her remaining funds into her exempt retirement accounts. *See Beverly*, 374 B.R. at 238.

    f.    The Debtor removed or concealed assets from the reach of the Nelsons because the Idaho Real Property was titled in the Defendants' names and the Debtor transferred the remaining Utah Real Property sale proceeds into her exempt retirement accounts.

    g.    The value of the consideration received by the Debtor was not reasonably equivalent to the value of the assets transferred because the Idaho Real Property was titled in the Defendants' names and the Debtor was not obligated on the purchase loan. To the extent the

COMPLAINT - 13

Debtor was obligated to the Defendants to repay the purchase loan despite not being listed as a borrower, that obligation would support a finding of a resulting trust as set forth in Count One.

   h. The Debtor was insolvent or became insolvent shortly after the transfers were made because she did not have sufficient assets to pay all of her creditors including the Nelsons.

   i. The transfer occurred shortly before the judgment was entered against the Debtor in the Utah state court litigation.

84. Besides the commonly recognized badges of fraud, the Debtor's intent to defraud, hinder, or delay her creditors may be inferred by her failure to cooperate with the Nelsons during their post-judgment discovery efforts. Specifically, the Debtor refused to answer the Nelsons' interrogatories regarding her property.

85. The Debtor's transfer of the funds to the Defendants to purchase the Idaho Real Property was a transfer of the Debtor's interest in property because the funds came from accounts over which she exercised dominion and control, and which could have been used to pay her creditors. *See, e.g., Beverly*, 374 B.R. at 223.

86. The Court should determine the amount of funds the Debtor transferred to the Defendants to purchase the Idaho Real Property.

87. Pursuant to 11 U.S.C. § 544(b)(1), the Trustee may avoid transfers under applicable law by a creditor holding an allowed unsecured claim. Pursuant to Idaho Code § 55-913(1)(a) of Idaho's UFTA, the Nelsons would be able to avoid the funds the Debtor transferred to the Defendants to purchase the Idaho Real Property. The analyses to avoid transfers under Idaho Code § 913(1)(a) and 11 U.S.C. § 548(a)(1)(A) are the same. *Acequia, Inc. v. Clinton (In re Acequia, Inc.)*, 34 F.3d 800, 812 (9th Cir. 1994).

88.  The Court should avoid the transfers from the Debtor to the Defendants to purchase the Idaho Real Property as actually fraudulent transfers under 11 U.S.C. §§ 544(b)(1) and 548(a)(1)(A).

## COUNT THREE
### Avoidance of the transfers of the funds the Debtor paid to the Defendants to purchase the Idaho Real Property under the Bankruptcy Code and Idaho's UFTA (constructive fraud)

89.  Paragraphs 1 through 88 are incorporated as if set forth fully in this Count.

90.  The Debtor's transfer of the funds to the Defendants to purchase the Idaho Real Property was a transfer of the Debtor's interest in property because the funds came from accounts over which she exercised dominion and control, and which could have been used to pay her creditors. *See, e.g., Beverly*, 374 B.R. at 223.

91.  The Debtor received less than reasonably equivalent value in exchange for transferring the funds to the Defendants to purchase the Idaho Real Property because the property was titled in the Defendants' names, and the Debtor was not obligated on the loan to purchase the property. To the extent the Debtor was obligated to the Defendants to repay the purchase loan despite not being listed as a borrower, that obligation would support a finding of a resulting trust as set forth in Count One.

92.  The Debtor was insolvent when she transferred the funds to the Defendants to purchase the Idaho Real Property because she did not have sufficient assets to pay all of her creditors including the Nelsons.

93.  The Court should determine the amount of funds the Debtor transferred to the Defendants to purchase the Idaho Real Property.

94.  Pursuant to 11 U.S.C. § 544(b)(1), the Trustee may avoid transfers under applicable law by a creditor holding an allowed unsecured claim. Pursuant to Idaho Code § 55-913(1)(b) of Idaho's UFTA, the Nelsons would be able to avoid the funds the Debtor transferred

COMPLAINT - 15

to the Defendants to purchase the Idaho Real Property. The analyses to avoid transfers under Idaho Code § 913(1)(b) and 11 U.S.C. § 548(a)(1)(B) are the same. *Hillen v. City of Many Trees, LLC (In re CVAH, Inc.)*, 570 B.R. 816, 839 (Bankr. D. Idaho 2017) (citing *Acequia, Inc.*, 34 F.3d at 810-11).

95. The Court should avoid the transfers from the Debtor to the Defendants to purchase the Idaho Real Property as constructively fraudulent transfers under 11 U.S.C. §§ 544(b)(1) and 548(a)(1)(B).

## COUNT FOUR
### Recovery of the funds used to purchase the Idaho Real Property under the Bankruptcy Code

96. Paragraphs 1 through 95 are incorporated as if set forth fully in this Count.

97. The Defendants are the initial transferees or the entities for whose benefit the transfers were made of the funds used to purchase the Idaho Real Property because the Debtor transferred the funds directly to the Defendants, the Idaho Real Property was subsequently titled in the Defendants' names, and the Defendants are obligated on the purchase loan. To the extent the Debtor was obligated to the Defendants to repay the purchase loan despite not being listed as a borrower, that obligation would support a finding of a resulting trust as set forth in Count One.

98. Recovering the funds the Debtor transferred to the Defendants to purchase the Idaho Real Property benefits the estate because the Trustee may use those funds to pay creditor claims.

99. To the extent the Defendants are subsequent transferees of any funds used to purchase the Idaho Real Property, the Defendants did not receive the funds in good faith because they were aware the Debtor was attempting to hinder, delay, or defraud her creditors by having the property titled in the Defendants' names.

100. Pursuant to 11 U.S.C. § 550(a), the Court should enter a judgment against the Defendants for the amount of funds the Debtor transferred to them to purchase the Idaho Real Property.

## COUNT FIVE
### Recovery of the Idaho Real Property under Idaho's UFTA

101. Paragraphs 1 through 100 are incorporated as if set forth fully in this Count.

102. Imposing a constructive trust on the Idaho Real Property is an allowable remedy under Idaho Code § 916(1)(b) and (c)(3) of Idaho's UFTA. *See Lujan v. Hillbroom*, No. 48168 (Idaho App. Aug 11, 2021) (citing Idaho Code § 916(1)).

103. Under Idaho law, "[a] constructive trust is an equitable remedy used to prevent injustice." *Rosauer v. Detiege (In re Detiege)*, No. 19-08029-JMM (Bankr. D. Idaho June 24, 2021). "A constructive trust is an appropriate remedy where it would be unconscionable for the holder of legal title to retain the benefits of the property." *Id*. (internal quotations omitted). For example, a court may impose a constructive trust where legal title to property has been obtained through fraud, misrepresentations, concealments, or "under circumstances otherwise rendering it unconscionable for the holder of legal title to retain beneficial interest in property." *Id*.

104. It would be unequitable for the Defendants to retain the benefit of having the property titled in their names because it would deprive the Debtor's creditors of a valuable asset from which their claims may be paid.

105. Allowing a creditor to levy execution upon the proceeds of an asset transferred is another allowable remedy under Idaho's UFTA. Idaho Code § 55-916(2).

106. The Court should impose a constructive trust on the Idaho Real Property under Idaho Code § 916(1) which, pursuant to 11 U.S.C. § 541(a)(7), would become estate property. The Court should also allow the Plaintiff to levy execution against the Idaho Real Property under Idaho Code § 55-916(2).

COMPLAINT - 17

WHEREFORE, the Plaintiff prays for relief from the Court as follows:

1. A judgment declaring that the Idaho Real Property is estate property under Idaho's resulting trust provisions as set forth in Count One.

2. A judgment identifying and avoiding the transfers of the funds the Defendants used to purchase the Idaho Real Property under 11 U.S.C. §§ 554(b)(1) and 548(a)(1)(A) as set forth in Count Two.

3. A judgment identifying and avoiding the transfers of the funds the Defendants used to purchase the Idaho Real Property under 11 U.S.C. §§ 544(b)(1) and 548(a)(1)(B) as set forth in Count Three.

4. A judgment against the Defendants for the amount of funds the Debtor transferred to them to purchase the Idaho Real Property, plus accruing interest as allowed by law, under 11 U.S.C. § 550(a) as set forth in Count Four.

5. A judgment imposing a constructive trust and/or allowing the Plaintiff to levy execution on the Idaho Real Property under Idaho Code § 916(1) and (2) as set forth in Count Five.

6. A judgment against the Defendants for the Plaintiff's court costs and reasonable attorneys' fees incurred in this proceeding as allowed by law. The Plaintiff does not intend to seek costs attorneys' fees against the Defendants if this matter is not contested.

7. For such other and further relief as the Court deems just and equitable.

DATED February 12, 2024.

SPINNER, WOOD & SMITH

By:/s/_____
Thomas D. Smith

COMPLAINT - 18